AO 106 (Rev. 04/10)  Application for a Search Warrant

EC

# UNITED STATES DISTRICT COURT
### for the
### Southern District of Ohio

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>One Apple iPhone X, belonging to Timothy Wright, bearing<br>serial number G0NW2EV0JCL8, obtained by HSI and<br>currently held at HSI storage located at 675 Brooksedge<br>Boulevard in Westerville, OH 43081 | )<br>)<br>)<br>)<br>)<br>)<br>)    Case No.   2:21-mj-568 |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A, incorporated herein by reference

located in the _____ Southern _____ District of _____ Ohio _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein by reference

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 2251, 2252, and 2252A | Production, Distribution, Receipt, and/or Possession of visual depictions of a minor engaged in sexually explicit conduct and/or child pornography. |
| 18 U.S.C. §§ 1591 and 1594 | Sex Trafficking of a Minor or the Conspiracy or Attempt to do so |

The application is based on these facts:

See attached affidavit incorporated herein by reference.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

SA Bianca Ragone, HSI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: ___August 30, 2021___

_____
Kimberly A. Jolson
United States Magistrate Judge

City and state: Columbus, Ohio

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO,**
**EASTERN DIVISION**

**IN THE MATTER OF THE SEARCH OF:**

| | | |
|---|---|---|
| **One Apple iPhone X, bearing serial number** | ) | |
| **G0NW2EV0JCL8, and IMSI number 310410066384069** | ) | **Case No.** 2:21-mj-568 |
| **belonging to Timothy Wright,** | ) | |
| **obtained by HSI and currently held at the** | ) | **Magistrate Judge** |
| **HSI Columbus office storage location located at** | ) | |
| **675 Brooksedge Blvd. Westerville, OH 43081** | ) | |

**UNDER SEAL**

**AFFIDAVIT IN SUPPORT OF SEARCH WARRANT**

I, Bianca Ragone (Your Affiant), a Special Agent with Homeland Security Investigations (HSI) being duly sworn, hereby depose and state:

## I.   INTRODUCTION

1. I am a Special Agent (SA) of Homeland Security Investigations (HSI), assigned to the Office of the Assistant Special Agent in Charge, Columbus, Ohio since September 2019. During my tenure as a Special Agent, I have completed the Criminal Investigator Training Program (CITP) and the Homeland Security Investigations Special Agent Training Program (HSISAT) at the Federal Law Enforcement Training Center (FLETC) in Glynco, Georgia. During CITP and HSISAT I have received training on cybercrimes, child exploitation, child pornography, and the dark web. I have been assigned to the Franklin County Internet Crimes Against Children (ICAC) Task Force investigation child exploitation offenses since November 2019.  Prior to that, I worked for the Federal Bureau of Investigation for three years as a Student Work Force Trainee on a Violent Crimes Task Force working child exploitation cases. Moreover, I am a federal law enforcement officer who is engaged in enforcing federal criminal laws, including 18 U.S.C. §§ 2251, 2252, 2252A, 1591, and 1594 and I am authorized by law to request a search warrant.

## II. PURPOSE OF THE AFFIDAVIT

2. The facts set forth below are based upon my own personal observations, investigative reports, and information provided to me by other law enforcement agents. I have not included in this affidavit all information known by me relating to the investigation. I have not withheld any evidence or information which would negate probable cause. I have set forth only the facts necessary to establish probable cause for a search warrant for the content of one iPhone X, bearing serial number G0NW2EV0JCL8 (hereinafter referred to as the **SUBJECT DEVICE**). **SUBJECT DEVICE** was seized from the residence of Timothy Wright located at 4329 Wyandotte Woods Blvd. Dublin, OH 43016, on August 2, 2021, while HSI agents were executing a state search warrant for the **SUBJECT DEVICE**. **SUBJECT DEVICE** is currently held in the custody of the HSI Columbus office.

3. The **SUBJECT DEVICE** to be searched is more particularly described in Attachment A, for the items specified in Attachment B, which items constitute instrumentalities, fruits, and evidence of violations of 18 U.S.C. §§ 2251, 2252, and 2252A – the production, receipt, and/or possession of child pornography and 18 U.S.C. §§ 1591 and 1594– sex trafficking of a minor or the conspiracy or attempt to do so. I am requesting authority to search the entirety of the **SUBJECT DEVICE**, wherein the items specified in Attachment B may be found, and to seize all items listed in Attachment B as instrumentalities, fruits, and evidence of crime.

## III. APPLICABLE STATUTES AND DEFINITIONS

4. Title 18 United States Code, Section 2251(a) makes it a federal crime for any person to employ, use, persuade, induce, entice, or coerce any minor to engage in, or have a minor assist any other person to engage in, any sexually explicit conduct for the purpose of producing any visual depiction of such conduct, if such person knows or has reason to know that either the visual depiction will be transported or transmitted via a facility of interstate or foreign commerce or in or affecting interstate or foreign commerce or mailed, or that the visual depiction was produced or transmitted using materials that have been mailed, shipped, or transported in or affecting interstate or foreign commerce, or if the visual depiction has actually been transported or transmitted using any means or facility of

interstate or foreign commerce or in or affecting interstate or foreign commerce. Subsection (e) of this provision further prohibits conspiracies or attempts to engage in such acts.

5. Title 18, United States Code, Section 2252, makes it a federal crime for any person to knowingly transport, receive, distribute, possess or access with intent to view any visual depiction of a minor engaging in sexually explicit conduct, if such receipt, distribution or possession utilized a means or facility of interstate commerce, or if such visual depiction has been mailed, shipped or transported in or affecting interstate or foreign commerce. This section also prohibits reproduction for distribution of any visual depiction of a minor engaging in sexually explicit conduct, if such reproduction utilizes any means or facility of interstate or foreign commerce or is in or affecting interstate commerce.

6. Title 18, United States Code, Section 2252A, makes it a federal crime for any person to knowingly transport, receive or distribute any child pornography using any means or facility of interstate commerce, or any child pornography that has been mailed, or any child pornography that has shipped or transported in or affecting interstate or foreign commerce by any means, including by computer. This section also makes it a federal crime to possess or access with intent to view any material that contains an image of child pornography that has been mailed, shipped or transported using any means or facility of interstate or foreign commerce, or in or affecting interstate commerce by any means, including by computer.

7. Title 18, United States Code, Section 1591, makes it a federal crime for any person, in or affecting interstate or foreign commerce, to knowingly recruit, entice, harbor, transport, provide, obtain, advertise, maintain, patronize or solicit a person who is less than 18 years old, to engage in a commercial sex act knowing that the person is less than 18 years old, or in reckless disregard of the fact. Section 1594 of the same title prohibits attempts or conspiracies to engage in such acts.

8. Pursuant to Title 18, United States Code, Section 1591(e) (3) the term "commercial sex act" is defined as "any sex act, on account of which anything of value is given to or received by any person."

9. The term "child pornography"[1], as it is used in 18 U.S.C. § 2252A, is defined pursuant to 18 U.S.C. § Section 2256(8) as "any visual depiction, including any photograph, film, video, picture, or computer or computer generated image or picture, whether made or produced by electronic, mechanical, or other means of sexually explicit conduct, where (A) the production of such visual depiction involves the use of a minor engaging in sexually explicit conduct; (B) such visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaging in sexually explicit conduct; or (C) such visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaging in sexually conduct.

10. The term "sexually explicit conduct", as used in 18 U.S.C. §§ 2251 and 2252, is defined pursuant to 18 U.S.C. § 2256(2)(A) as "actual or simulated (i) sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex; (ii) bestiality; (iii) masturbation; (iv) sadistic or masochistic abuse; or (v) lascivious exhibition of the genitals or pubic area of any person." Pursuant to 18 U.S.C. § 2256(2)(B), "sexually explicit conduct" when used to define the term child pornography, also means "(i) graphic sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex, or lascivious simulated sexual intercourse where the genitals, breast, or pubic area of any person is exhibited; (ii) graphic or lascivious simulated; (I) bestiality; (II) masturbation; or (III) sadistic or masochistic abuse; or (iii) graphic or simulated lascivious exhibition of the genitals or pubic area of any person."

11. The term "minor," as used herein, is defined pursuant to Title 18, U.S.C. § 2256(1) as "any person under the age of eighteen years."

12. The term "visual depiction," as used herein, is defined pursuant to Title 18 U.S.C. § 2256(5) to "include undeveloped film and videotape, and data stored on computer disk or by electronic means which is capable of conversion into a visual image."

13. "Graphic" when used with respect to a depiction of sexually explicit conduct, means that viewer can observe any part of the genitals or pubic area of any depicted person or animal

---

1 The term child pornography is used throughout this affidavit. All references to this term in this affidavit and Attachments A and B, include both visual depictions of minors engaged in sexually explicit conduct as referenced in 18 U.S.C. § 2252 and child pornography as defined in 18 U.S.C. § 2256(8).

during any part of the time that the sexually explicit conduct is being depicted. (18 U.S.C. § 2256(10)).

14. The term "computer"[2] is defined in Title 18 U.S.C. § 1030(e)(1) as an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical or storage functions and includes any data storage facility or communications facility directly related to or operating in conjunction with such device.

15. The terms "records," "documents," and "materials," as used herein, include all information recorded in any form, visual or aural, and by any means, whether in handmade form (such as writings), photographic form (including, but not limited to, microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, photocopies), mechanical form (such as printing or typing) or electrical, electronic or magnetic form (such as any and all digital data files and printouts or readouts from any magnetic, electrical, or electronic storage device).

16. "Internet Service Providers" (ISPs), used herein, are commercial organizations that are in business to provide individuals and businesses access to the Internet, web hosting, email, remote storage, and co-location of computers and other communications equipment.

17. "Internet Protocol address" (IP address), as used herein, is a code made up of numbers separated by dots that identifies particular computer on the Internet. Every computer requires an IP address to connect to the Internet. IP addresses can be dynamic, meaning that the ISP assigns a different unique number to a computer every time it accesses the Internet. IP addresses might also be static, if an ISP assigns a user's computer a particular IP address which is used each time the computer accesses the Internet.

18. As it is used throughout this affidavit and all attachments hereto, the term "storage media" includes any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

---

[2] The term "computer" is used throughout this affidavit to refer not only to traditional laptop and desktop computers, but also to internet-capable devices such as cellular phones and tablets. Where the capabilities of these devices differ from that of a traditional computer, they are discussed separately and distinctly.

## IV.  BACKGROUND REGARDING COMPUTERS, DIGITAL STORAGE DEVICES, THE INTERNET

19. I know from my training and experience that computer hardware, computer software, and electronic files ("objects") may be important to criminal investigations in two distinct ways: (1) the objects themselves may be evidence, instrumentalities, or fruits of crime, and/or (2) the objects may be used as storage devices that contain contraband, evidence, instrumentalities, or fruits of crime in the form of electronic data. Rule 41 of the Federal Rules of Criminal Procedure permits the government to search for and seize computer hardware, software, and electronic files that are evidence of a crime, contraband, and instrumentalities and/or fruits of crime.

20. Computers, mobile devices and the Internet have revolutionized the ways in which those with a sexual interest in children interact with each other and with children they seek to exploit.  These new technologies have provided ever-changing methods for exchanging child pornography and communicating with minors.  Digital technology and the Internet serve four functions in connection with child pornography and child exploitation: production, communication, distribution, and storage.

21. Computers, tablets and smart/cellular phones ("digital devices") are capable of storing and displaying photographs.  The creation of computerized or digital photographs can be accomplished with several methods, including using a "scanner," which is an optical device that can digitize a photograph.  Another method is to simply take a photograph using a digital camera or cellular phone with an onboard digital camera, which is very similar to a regular camera except that it captures the image in a computerized format instead of onto film.  Such computerized photograph files, or image files, can be known by several file names including "GIF" (Graphic Interchange Format) files, or "JPG/JPEG" (Joint Photographic Experts Group) files.

22. Digital devices are also capable of storing and displaying movies of varying lengths.  The creation of digital movies can be accomplished with several methods, including using a digital video camera (which is very similar to a regular video camera except that it captures the image in a digital format which can be transferred onto the computer).  Such computerized movie files, or video files, can be known by several file names including "MPG/MPEG" (Moving Pictures Experts Group) files.

23. The capability of digital devices to store images in digital form makes them an ideal repository for child pornography.  A single CD, DVD, or USB thumb drive can store hundreds or thousands of image files and videos.  It is not unusual to come across USB thumb drives that are as large as 32GB.  The size of hard drives and other storage media that are used in home computers and cellular phones have grown tremendously within the last several years.  Hard drives with the capacity of several terabytes are not uncommon.  These drives can store hundreds of thousands of images and videos at very high resolution.  Tablet devices have average storage capabilities ranging from 4 Gigabytes to 256 Gigabytes.  In addition, most tablets have the ability to utilize the various drives (thumb, jump or flash) described above, which can allow a user to access up to an additional 256 Gigabytes of stored data via the tablet.  Modern cell phones have average storage capabilities ranging from 4 Gigabytes to 128 Gigabytes.  In addition, most cellular phones have the ability to utilize micro SD cards, which can add up to an additional 128 Gigabytes of storage.  Media storage devices and cellular phones can easily be concealed and carried on an individual's person.  Mobile computing devices, like cellular phones and tablets, also have the ability to take still and moving images that are easily stored, manipulated or transferred between devices using software or applications installed on each device.  Additionally, multiple devices can be synced to a single account and when an image or video file is transferred it can be transferred to all devices synced to the account at the same time.  As a result of this technology, it is relatively inexpensive and technically easy to produce, store and distribute child pornography.  Magnetic storage located in host computers adds another dimension to the equation.  It is possible to use a video camera to capture an image, process that image in a computer with a video capture board, and to save that image by storing it in another country.  Once this is done, there is no readily apparent evidence at the scene of the crime.  Only with careful laboratory examination of electronic storage devices is it possible to recreate the evidence trail.

24. The Internet is a worldwide network of computer systems operated by governmental entities, corporations, and universities.  With a computer or mobile device connected to the Internet, an individual user can make electronic contact with millions of other computer or mobile device users around the world.  Many individual computer/mobile device users and businesses obtain their access to the Internet through businesses known as Internet Service

Providers ("ISPs"). ISPs provide their customers with access to the Internet using wired telecommunications lines, wireless signals commonly known as Wi-Fi, and/or cellular service; provide Internet e-mail accounts that allow users to communicate with other Internet users by sending and receiving electronic messages through the ISPs' servers or cellular network; remotely store electronic files on their customers' behalf; and may provide other services unique to each particular ISP. ISPs maintain records pertaining to the individuals or companies that have subscriber accounts with the ISP. Those records may include identifying and billing information, account access information in the form of log files, e-mail transaction information, posting information, account application information, Internet Protocol ("IP") addresses3 and other information both in computer data format and in written record format.

25. These internet-based communication structures are ideal for those seeking to find others who share a sexual interest in children and child pornography or seeking to exploit children online. Having both open as well as anonymous communication capability allows the user to locate others of similar inclination and still maintain their anonymity. Once contact has been established, it is then possible to send messages and graphic images to other trusted child pornography collectors or to vulnerable children who may not be aware of the user's true identity. Moreover, the child pornography collector need not use large service providers. Child pornography collectors can use standard Internet connections, such as those provided by businesses, universities, and government agencies, to communicate with each other or with children, and to exchange child pornography. These communication links allow contacts around the world as easily as calling next door. Additionally, these communications can be quick, relatively secure, and as anonymous as desired.

26. It is often possible to recover digital or electronic files, or remnants of such files, months or even years after they have been downloaded onto a hard drive or other digital device, deleted, or viewed via the Internet. Such files can be stored for years at little or no cost. Even when such files have been deleted, they can be recovered months or even years later using readily available forensic tools. When a person "deletes" a file from a digital device, the data contained in the files does not actually disappear; rather the data remains on the device until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space - that is, space on a storage medium that is not

allocated to a set block of storage space – for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

27. Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache." The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages. Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits.

28. As is the case with most digital technology, communications by way of computer or mobile devices can be saved or stored on the computer or mobile device used for these purposes. Storing this information can be intentional, i.e., by saving an e-mail as a file on the computer or mobile device, or saving the location of one's favorite websites in, for example, "bookmarked" files. Digital information can also be retained unintentionally, e.g., traces of the path of an electronic communication may be automatically stored in many places, such as temporary files or ISP client software, among others. In addition to electronic communications, a computer user's Internet activities generally leave traces or "footprints" in the web cache and history files of the browser used. Such information is often maintained indefinitely until overwritten by other data.

29. Searching computer systems and electronic storage devices may require a range of data analysis techniques. Criminals can mislabel or hide files and directories, encode communications, attempt to delete files to evade detection, or take other steps to frustrate law enforcement searches. In light of these difficulties, your affiant requests permission to use whatever data analysis techniques appear necessary to locate and retrieve the evidence described in Attachment B.

## V. SPECIFICS OF SEARCH AND SEIZURE OF COMPUTER SYSTEMS

30. Searches and seizures of evidence from computers commonly require agents to download or copy information from the computers and their components or seize most or all computer items (computer hardware, computer software, and computer related documentation) to be processed later by a qualified computer expert in a laboratory or other controlled environment. This is almost always true because of the following:

a) Computer storage devices (like hard disks, diskettes, tapes, laser disks, magneto opticals, and others) can store the equivalent of thousands of pages of information. Especially when the user wants to conceal criminal evidence, he or she often stores it in random order with deceptive file names. This requires searching authorities to examine all the stored data to determine whether it is included in the warrant. This sorting process can take days or weeks, depending on the volume of data stored, and it would be generally impossible to accomplish this kind of data search on site; and

b) Searching computer systems for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications, so it is difficult to know before a search which expert should analyze the system and its data. The search of a computer system is an exacting scientific procedure which is designed to protect the integrity of the evidence and to recover even hidden, erased, compressed, password-protected, or encrypted files. Since computer evidence is extremely vulnerable to tampering or destruction (which may be caused by malicious code or normal activities of an operating system), the controlled environment of a laboratory is essential to its complete and accurate analysis.

31. In order to fully retrieve data from a computer system, the analyst needs all magnetic storage devices as well as the central processing unit (CPU) as well as all the system software (operating systems or interfaces, and hardware drivers) and any applications software, which may have been used to create the data (whether stored on hard drives or on external media).

## VI. INVESTIGATION AND PROBABLE CAUSE

32. In late July of 2021, Special Agents (SAs) from Homeland Security Investigations (HSI) received information from the Delaware County Juvenile Court and Columbus Division of Police Missing Persons Unit (CPD) regarding three minor females. More specifically, SAs learned that in early to mid-July, a 16-year-old female (herein referred to as MV1), and a 15-year-old female (herein referred to as MV2), and a 17-year-old female (herein referred to as MV3), had all been reported missing. Furthermore, SA's learned that all three MV's

were good friends that had gone missing in May 2021, been recovered, and then gone missing again in July 2021. SAs also received information that based on the information received thus far regarding the MV's they were possible victims of sex trafficking.

33. During the investigation into the whereabouts of all three MV's, law enforcement spoke to a family member of MV2 on July 27, 2021. During that conversation, law enforcement learned that MV2 had been receiving multiple phone calls from phone number (352) 302-2819 and had also been dialing that same phone number. In an effort to ascertain who MV2 had been communicating with in conjunction to locating her, an open-source search revealed for the phone number (352) 302-2819 was completed. Law enforcement learned from that search that the phone number belonged to a company listed as L&T Trucking and an individual by the name Timothy WRIGHT.

34. On July 28, 2021, investigators also spoke with a family member of MV3 and learned that on May 30, 2021, MV3's family member had received a payment from the Cash App account $Lttrucking28 for the sole purpose of turning MV3's phone back on. More specifically, law enforcement learned that MV3 had contacted her family member from an unidentified phone number to coordinate this payment from the $Lttrucking28 Cash App account. In addition, when MV3 called her family member to set up this payment, law enforcement learned that MV3 was with MV2 and an unknown male's voice was also heard in the background whom MV3 later identified as MV2's "sugar daddy."

35. On July 29, 2021, investigators also learned from a family member of MV1 that MV1 had last been seen leaving the home in a newer black Cadillac Escalade with no front plate being driven by a white unknown male.

36. Investigators conducted an on open-source search in the Cash App application for the profile of $Lttrucking28 which revealed a vanity name listed as Tim Wright (WRIGHT).

37. Investigators conducted records checks with through the Ohio Bureau of Motor Vehicles which revealed WRIGHT had a listed address of 4329 Wyandotte Woods Blvd, in Dublin, Ohio. WRIGHT had registered this Dublin, Ohio address on his most recent driver's license and in addition, WRIGHT used this same address to register a 2021 black Cadillac Escalade bearing Ohio license plate HDZ5952.

38. On July 29, 2021, SAs served a subpoena to Square, Inc. for subscriber information relating to the Cash App account, $Lttrucking28. That same day SAs received the following identifying subscriber information for the $Lttrucking28 Cash App account:

> Full name: Timothy WRIGHT
>
> Date of Birth: 08/03/1971
>
> Last four of Social: 8531
>
> Phone Number: (352) 302-2819

39. The phone number (352) 302-2819 received from Cash App resolved to AT&T. On July 29, 2021, SAs served a subpoena to AT&T for subscriber information related to the above-mentioned phone number linked to WRIGHT. That same day SAs received the following identifying information:

> Financial Liable Party: L&T Trucking Inc.
>
> Contact Name: Timothy WRIGHT
>
> Contact Home Email: Lttrucking28@gmail.com

40. In additional to the subscriber information received from AT&T, call records were received which indicated the cell phone associated with WRIGHT's (352) 302-2819 phone number was an iPhone X bearing IMSI number 310410066384069 (**SUBJECT DEVICE**). In review of those call records, SAs noted between May 2021 and July 2021, phone calls and text messages were made between WRIGHT and MV2 as well as WRIGHT and MV3.

41. On July 31, 2021, Franklin County Sheriff's Office (FCSO) obtained a search warrant for the **SUBJECT DEVICE**. On August 2, 2021, FCSO located WRIGHT at his Dublin, Ohio residence and the **SUBJECT DEVICE** was given to officers by WRIGHT upon arrival at the residence pursuant to the search warrant.

42. Law enforcement then engaged in a consensual conversation with WRIGHT at his residence. During that conversation, WRIGHT was shown a photograph of all three MVs. WRIGHT indicated he recognized the face of MV1 but did not know her true name. WRIGHT stated he also recognized MV2 and knew her by a nickname and recognized MV3 whom he knew by true first name. WRIGHT stated that he thought all three MVs were 18 years old and that he had previously tried to "help them out." WRIGHT also admitted that he had all three MVs to his house before and that the last time he had seen them, WRIGHT had picked up MV1 from MV1's house and had dropped all MVs off at an

unknown location north of I-71. WRIGHT further indicated that he did not know the current whereabouts of any of the MVs.

43. A cursory review of the **SUBJECT DEVICE** confirmed that MV2's nickname and real name were one of WRIGHT's contacts listed in the **SUBJECT DEVICE**. In addition to that, during the cursory review, officers observed images depicting what appeared to be nude female minors.

44. Based on the cursory review, law enforcement obtained a second search warrant for the **SUBJECT DEVICE** on August 9, 2021.

45. On August 10, 2021, a forensic extraction of the **SUBJECT DEVICE** was completed. In the initial review of that extraction, law enforcement recovered text messages via iPhone messenger which indicated that WRIGHT coordinated dates and times to meet with the MVs, negotiated prices for nude or explicit photographs of all three MVs, and paid MV2 and MV3 via the Cash App application for nude photographs.

46. More specifically, a review of a portion of the text messages from that extraction revealed that WRIGHT and MV3 had been in contact between the dates of June 9, 2021 and July 15, 2021. Law enforcement specifically noted the following two conversations between MV3 and WRIGHT:

- On June 9, 2021, at approximately 5:15pm, MV3 sent a text message to WRIGHT containing images and videos which depicted MV3 wearing a tank top and underwear. In response, WRIGHT sent a text message to MV3 stating "those are nice, but not nude lol... Send some of your front :)" MV3 then sent WRIGHT a five second video depicting her nude genitalia. Text messages further indicate that, at the request of MV3, WRIGHT send the money owed to MV3 for the nude videos to MV2.

- On June 14, 2021, at approximately 4:35pm, text messages reveal that MV3 and WRIGHT were negotiating a price they both could agree on in exchange for MV3 sending WRIGHT nude images of herself. Specifically, MV3 sent WRIGHT a text stating "100 or less?" WRIGHT then responded with "yeah a lot less lol....I'm more into the meetings instead of pics." MV3 then followed up with WRIGHT and sent a text message stating "50?...75?" In response, WRIGHT

wrote "how about 40 lol....I only need a few pics/videos". MV3 then agreed with WRIGHT on that price and indicated to WRIGHT that she will send it.

   – On June 14, 2021, at approximately 5:14pm. MV3 sent a text message to WRIGHT which contained a six second video depicting MV3 displaying her nude genitalia and face. MV3 then sent WRIGHT a second text message containing another six second video which depicted MV3 using her hand to spread apart her nude genitalia. WRIGHT then responded to both videos "wow!nice (heart eyes emoji)....def can't wait to see it in person 😊".

47. Further review of text messages revealed that on June 9, 2021, WRIGHT negotiated with MV2, indicating to MV2 that he would pay MV2 $60. In exchange for that money, MV3 was to send three nudes that included MV3's face. WRIGHT then noted to MV3 that the portion of the $60 that belonged to MV3 was in exchange for the video that MV3 had sent WRIGHT on June 9, 2021. SAs knew that video to be the five second video of MV3 which depicted MV3's nude genitalia.

48. Law enforcement also recovered a text message exchange occurring on June 9, 2021 in which WRIGHT asked MV3 her age. In response, MV3 stated "17 years old."

49. In continuing the investigation into WRIGHT, SAs then compared the above text messages from **SUBJECT DEVICE** with the results from the Cash App subpoena. In that comparison, SAs documented two payments labeled "personal" to MV2 on June 9, 2021, which SAs noted was the same date the text messages indicated WRIGHT was sending money to MV2 via the Cash App. The first payment was in the amount of $60 and the second was in the amount of $30. Both payments were sent to MV2 from the $Lttrucking28 Cash App account.

50. In addition, SA's documented one payment labeled "personal" to MV3 for $40 on June 14, 2021. This was the same date MV3 had sent WRIGHT a video depicting MV3 using her hand to spread apart her nude genitalia. The payment to MV3 was sent from WRIGHT again using the $Lttrucking28 Cash App account.

51. Furthermore, the investigation revealed that the results of the Cash App subpoena return indicated WRIGHT had transferred over $1200 to the three MVs between May 1, 2021, and July 29, 2021.

52. On August 12, 2021, all three MVs were recovered together in the Columbus, Ohio area.

53. On August 18, 2021, an interview of all three MVs were conducted separately at the Child Assessment Center (CAC).

54. During the interview with MV1, MV1 indicated she sent WRIGHT three pictures of herself depicting partial nudity when she was 16 years old, and that in exchange, WRIGHT paid her $60 via Cash App using a trucking company account. MV3 identified herself in a screenshot of a photo she sent WRIGHT that was recovered off **SUBJECT DEVICE**. According to MV1, WRIGHT offered more money for nude pictures of her vagina, but she didn't feel comfortable and never sent them.

55. During the interview with MV2, MV2 indicated she met WRIGHT less than a year ago. MV2 stated she had been to WRIGHT's house and went there with MV1 and MV3. MV2 confirmed that WRIGHT sent MV2 money through CashApp or paid her in cash for nude pictures. MV2 identified herself in a screenshot of a nude video she sent WRIGHT that was recovered off **SUBJECT DEVICE**. MV2 stated that WRIGHT paid as much as $300 - $400 for his encounters with MV2. In addition, MV2 stated that when she arrived at WRIGHT's house, she went upstairs to WRIGHT's bedroom where he masturbated and ejaculated on her body. MV2 stated that WRIGHT took her shirt off and tried pushing his penis into her vagina but that they never had sex. MV2 confirmed that WRIGHT knew her true age.

56. During the interview with MV3, MV3 stated she went to WRIGHT's house located in Dublin, Ohio at least five times in a five-week period beginning in June or July of 2021. MV3 stated that when she was at his house, she would lay naked on WRIGHT's bed with her legs spread apart. WRIGHT would then masturbate and ejaculate on to her stomach area. In exchange for that sex act, WRIGHT would pay MV3 $300 and MV3 stated she received that money via Cash App or in cash. MV3 also stated she sent WRIGHT nude videos via text message in exchange for money and identified herself in a still image that was recovered off **SUBJECT DEVICE** depicting MV3 and her nude genitalia.

57. Based upon the above information, your affiant believes that there is probable cause that **SUBJECT DEVICE** contains additional evidence of child pornography, child exploitation activities, and sex trafficking of minors.

## VII.   SEARCH METHODOLOGY TO BE EMPLOYED

58. *Nature of examination.*  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of **SUBJECT DEVICE** consistent with the warrant.  The examination may require authorities to employ techniques, including but not limited to computer-assisted scans, downloading or copying of the entire device, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.  Specifically, such techniques may include, but are not limited to:

1. Examination of all of the data contained in any computer hardware, computer software, and/or memory storage devices to view the data and determine whether that data falls within the items listed in Attachment B;

2. Searching for and attempting to recover any deleted, hidden, or encrypted data to determine whether that data falls within the list of items in Attachment B;

3. Surveying various files, directories and the individual files they contain;

4. Opening files in order to determine their contents;

5. Scanning storage areas;

6. Performing key word searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are likely to appear in the evidence described in Attachment B; and/or

7. Performing any other data analysis technique that may be necessary to locate and retrieve the evidence described in Attachment B.

59. *Manner of execution.*  Because this warrant seeks only permission to examine devices already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises.  Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## VIII.  COMMON CHARACTERISTICS OF INDIVIDUALS WITH A SEXUAL INTEREST IN CHILDREN

60.   Based on my own knowledge, experience, and training in child exploitation and child pornography investigations, and the training and experience of other law enforcement officers

with whom I have had discussions, there are certain characteristics common to individuals who have a sexual interest in children and who produce, distribute, and receive child pornography:

a) Those who have a sexual interest in children and who produce, distribute, and receive child pornography may receive sexual gratification, stimulation, and satisfaction from contact with children; or from fantasies they may have viewing children engaged in sexual activity or in sexually suggestive poses, such as in person, in photographs, or other visual media; or from literature describing such activity.

b) Those who have a sexual interest in children and who produce, distribute, and receive child pornography may collect sexually explicit or suggestive materials, in a variety of media, including photographs, magazines, motion pictures, video tapes, books, slides and/or drawings or other visual media. Child pornography collectors oftentimes use these materials for their own sexual arousal and gratification. Further, they may use these materials to lower the inhibitions of children they are attempting to seduce, to arouse the selected child partner, or to demonstrate the desired sexual acts.

c) Those who have a sexual interest in children and who produce, distribute, and receive child pornography often times possess and maintain any "hard copies" of child pornographic material that may exist, that is, their pictures, films, video tapes, magazines, negatives, photographs, correspondence, mailing lists, books, tape recordings, etc., in the privacy and security of their home or some other secure location. These individuals typically retain pictures, films, photographs, negatives, magazines, correspondence, books, tape recordings, mailing lists, child erotica, and video tapes for many years. More recently, however, it has become more common for people who have a sexual interest in children to download, view, then delete child pornography on a cyclical and repetitive basis, and to regularly delete any communications about the sexual abuse of children rather than storing such evidence on their computers or digital devices. Traces of such activity can often be found on such people's computers or digital devices, for months or even years after any downloaded files have been deleted.

d) Likewise, those who have a sexual interest in children and who produce, distribute, and receive child pornography often maintain their collections that are in a digital or electronic format in a safe, secure, and private environment, such as a computer and

surrounding area. These collections are often maintained for several years and are kept close by, usually at the collector's residence, to enable the collector to view the collection, which is valued highly.

e) Those who have a sexual interest in children and who produce, distribute, and receive child pornography also may correspond with and/or meet others to share information and materials; rarely destroy correspondence from other child pornography distributors/collectors; conceal such correspondence as they do their sexually explicit material; and sometimes maintain lists of names, addresses, and telephone numbers of individuals with whom they have been in contact and who share the same interests in child pornography.

f) Those who have a sexual interest in children and who produce, distribute, and receive child pornography rarely are able to abstain from engaging in sexual exploitation of children or child pornography activities for any prolonged time period. This behavior has been documented by law enforcement officers involved in the investigation of child pornography offenders throughout the world.

61. When images and videos of child pornography are produced and stored on computers and related digital media, forensic evidence of the production, distribution, saving, and storage of such evidence may remain on the computers or digital media for months or even years even after such images and videos have been deleted from the computers or digital media.

62. Based upon the conduct of individuals who have a sexual interest in children and who produce, distribute, and receive child pornography set forth in the above paragraphs, namely, that they tend to maintain their collections at a secure, private location for long periods of time, that they rarely are able to abstain from child pornography activities for a prolonged period of time, and that forensic evidence of the downloading, saving, and storage of such evidence may remain on the computers or digital media for months or even years even after such images and videos have been deleted from the computers or digital media, there is probable cause to believe that evidence of the offenses of production, distribution and possession of child pornography is currently located on the **SUBJECT DEVICE**.

## IX. CONCLUSION

63. Based on all the forgoing factual information, there is probable cause to believe that of violations of 18 U.S.C. §§ 2251, 2252, and 2252A – the production, receipt, and/or possession of child pornography and 18 U.S.C. §§ 1591 and 1594 – sex trafficking of a minor or the conspiracy or attempt to do so, have been committed and that evidence, fruits and instrumentalities of these offenses will be found within **SUBJECT DEVICE** listed in Attachment A, which is incorporated herein by reference. Your affiant therefore respectfully requests that the Court issue a search warrant authorizing the search of **SUBJECT DEVICE** described in Attachment A, and the seizure of the items described in Attachment B.

Bianca Ragone
Special Agent
Homeland Security Investigations

Sworn to and subscribed before me this 30th day of August, 2021.

Kimberly A. Jolson
United States Magistrate Judge

## ATTACHMENT A

## PROPERTY TO BE TO BE SEARCHED

The devices to be searched are the following:

1. iPhone X, bearing serial number G0NW2EV0JCL8 and IMSI number 310410066384069.

**SUBJECT DEVICE** was seized from the residence of Timothy WRIGHT located at 4329 Wyandotte Woods Blvd. Dublin, OH 43016, on August 2, 2021, while HSI agents were executing a state search warrant for the **SUBJECT DEVICE**. **SUBJECT DEVICE** is currently held in the custody of the HSI Columbus office.

This warrant authorizes the forensic examination of **SUBJECT DEVICE** for the purpose of identifying the electronically stored information described in Attachment B.

## ATTACHMENT B
### LIST OF ITEMS TO BE SEIZED

The following materials which constitute evidence of the commission of a criminal offense, contraband, the fruits of crime, or property designed or intended for use or which is or has been used as the means of committing a criminal offense, namely violations of 18 U.S.C. §§ 2251, 2252, and 2252A – the production, receipt, and/or possession of child pornography and 18 U.S.C. §§ 1591 and 1594– sex trafficking of a minor or the conspiracy or attempt to do so, those violations involving **Timothy WRIGHT**, including:

1. Any and all computer software, including programs to run operating systems, applications (such as word processing, graphics, or online storage or chat programs), utilities, compilers, interpreters, and communications programs.

2. Any and all notes, documents, records, or correspondence, in any format and medium (including, but not limited to, e-mail messages, chat logs, and electronic messages,) pertaining to the production, possession, receipt, or distribution of child pornography.

3. In any format and medium, all originals, computer files, copies, and negatives of child pornography and child erotica, including photographs of children that are not sexually explicit, drawings, sketches, fantasy writings, diaries, and sexual aids.

4. Any and all notes, documents, records, or correspondence, in any format or medium (including, but not limited to digital files, e-mail messages, chat logs and electronic messages), identifying persons transmitting, through interstate or foreign commerce by any means, including, but not limited to, by U.S. mail or by cellular phone or computer, any child pornography or payments for child pornography or sex trafficking of minors.

5. Any and all notes, documents, records, or correspondence, in any format or medium (including, but not limited to, e-mail messages, chat logs and electronic messages, and other digital data files) concerning communications related to the sexual abuse, sexual trafficking of minors, or exploitation of minors.

6. Any and all records, documents, invoices and materials, in any format or medium (including, but not limited to, envelopes, letters, papers, e-mail messages, chat logs and electronic messages, and other digital data files) that concern any accounts with an Internet Service Provider or Electronic Communications Service.

7. Any and all files, documents, records, or correspondence, in any format or medium (including, but not limited to, network, system, security, and user logs, databases, software registrations, data and meta data), that concern user attribution information.

8. Any and all visual depictions of minors, whether clothed or not, for comparison to any child pornography or child erotica found during the execution of this search warrant or obtained during the course of this investigation.

9. Any and all diaries, notebooks, notes, and any other records reflecting personal contact and any other activities with minors visually depicted while engaged in sexually explicit conduct.

10. Any Internet or cellular telephone communications (including email, social media, online chat programs, etc.) with others in which child exploitation materials and offenses are discussed, posted, and/or traded;

11. Any Internet or cellular telephone communications (including email, social media, etc.) with minors;

12. Evidence of the utilization of peer-to-peer file sharing programs;

13. Evidence of utilization of user names or aliases, email accounts, social media accounts, and online chat programs, and usernames, passwords, and records related to such accounts;

14. Evidence of software that would allow others to control **SUBJECT DEVICE**, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the

presence or absence of security software designed to detect malicious software and evidence of the lack of such malicious software;

15. Evidence indicating the computer user's state of mind as it relates to the crimes under investigation;

16. Evidence that **SUBJECT DEVICE** was attached to any other digital device or digital storage medium;

17. Evidence of counter-forensic programs (and associated data) that are designed to eliminate data from **SUBJECT DEVICE;**

18. Passwords, encryption keys, and other access devices that may be necessary to access **SUBJECT DEVICE;**

19. Records of or information about Internet Protocol addresses used by **SUBJECT DEVICE;**

20. Records of or information about any Internet activity occurring on **SUBJECT DEVICE,** including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the HSI may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.